## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CIVIL ACTION NO. 18CV 14420

FILED by ___ D.C.

OCT 1 2 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – W.P.B.

|  |  |  |
|---|---|---|
| UNITED STATES *EX. REL.* DR. PATRICK REGAN, D.O., | : | |
| | : | |
| PLAINTIFF AND RELATOR, | : | **FILED UNDER SEAL** |
| | : | |
| VS. | : | **DO NOT SERVE** |
| | : | |
| LAWNWOOD MEDICAL CENTER, INC., D/B/A LAWNWOOD REGIONAL MEDICAL CENTER AND HEART INSTITUTE, AND HCA HEALTHCARE, INC. | : | **DO NOT PUT ON PACER** |
| | : | |
| DEFENDANTS. | : | |

### COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
### QUI TAM COMPLAINT

The Relator, Dr. Patrick Regan, D.O., brings this qui tam action in the name of the United States against Lawnwood Medical Center, Inc., d/b/a Lawnwood Regional Medical Center and Heart Institute, and HCA Healthcare, Inc. and states as follows:

### INTRODUCTION

1.      Relator Dr. Patrick Regan, D.O. ("Relator" or "Regan") brings this action on behalf of the United States of America and himself against Lawnwood Medical Center, Inc. d/b/a Lawnwood Regional Medical Center and Heart Institute ("Lawnwood"), and its corporate parent, HCA Healthcare, Inc. ("HCA") (collectively, "Defendants") to recover damages and penalties under the federal False Claims Act. 31 U.S.C. §§ 3729 *et seq.*

2.      This case concerns fraudulent Trauma Activations and related fees.  Lawnwood operates a Level II Trauma Center in Fort Pierce, Florida.  A Trauma Center is a specialized unit

of a hospital that has the equipment and staff necessary to treat persons who have suffered traumatic injury, such as from motor vehicle accidents and gunshot wounds. A Trauma Center is not a mere emergency room. Trauma Centers are equipped to handle injuries above and beyond the capabilities of an emergency room. By law, Trauma Centers must be certified by the state and have a Trauma Team available 24-hours a day. A Trauma Team consist of various professionals, including but not limited to, an emergency physician, trauma surgeon, trauma nurse, radiology technician, and respiratory therapist.

3.      Trauma victims typically arrive to a Trauma Center by way of emergency transport, such as ambulance or helicopter. When the Trauma Center receives pre-hospital notification, usually from Emergency Medical Services ("EMS"), it issues a Trauma Alert, also called a Trauma Activation. The Trauma Activation sends a signal to all members of the Trauma Team to drop what they are doing and report promptly to the Trauma Center.

4.      Patients who arrive pursuant to a Trauma Activation receive medical treatment and attention different from the treatment received in an emergency room. As an example, trauma nurses immediately use scissors to cut a trauma patient's clothes away from the body in order to allow a full trauma exam. Trauma clinicians also typically order more laboratory, diagnostic and imaging testing to review the patient's condition. Trauma surgeons, like Relator, evaluate every trauma patient for any immediate surgery that might need to be performed.

5.      Hospitals bill Medicare and other government healthcare programs for Trauma Activation fees, separate and apart from any other services delivered to the patient. In other words, the mere act of calling the Trauma Team to the Trauma Center results in a separate billable event. Apart from the activation fee, Trauma Activation also results in a cascade of additional charges,

2

including professional fees from the members of the Trauma Team, and laboratory and diagnostic tests. The government billing that stems from a typical Trauma Activation routinely exceeds $10,000.

6.    Hospitals bill for Trauma Activation using standardized codes adopted by the National Uniform Billing Committee or "NUBC" and approved for use by Medicare. These codes include instructions that dictate the specific criteria under which Trauma Activation fees can be billed. These criteria include the following:

> The Trauma Center must receive pre-hospital notification, such as from EMS, before it can bill Trauma Activation fees; and

> The trauma victim must satisfy the field triage criteria set by local or state law or by the American College of Surgeons.

*See Official UB-04 Data Specifications Manual* (Instructions for Revenue Code 068X). When a Hospital submits a bill making use of these standardized codes, the bill itself constitutes an affirmative representation that the criteria necessary to use the codes have been satisfied.

7.    In the State of Florida, the Department of Health has adopted specific field triage criteria for triggering a Trauma Alert. These criteria, set forth in Section 64J of the Florida Administrative Code, apply to paramedics and other first responders in assessing trauma incidents. When a Trauma Center receives pre-hospital notification and these criteria are satisfied, Medicare has agreed to pay the expensive fees associated with Trauma Activation. Absent these conditions, Medicare has not agreed to pay for Trauma Activation.

8.    Beginning in 2014, HCA implemented new trauma criteria at its Trauma Centers, including the Lawnwood Trauma Center. HCA's new criteria had never been approved by the State of Florida. HCA unilaterally expanded the definition of "trauma" to encompass a fairly

common emergency room visit, namely, elderly persons who have suffered a ground level fall. In particular, HCA decided to perform full Trauma Activations whenever a patient met the following criteria:

- Age 75 years or greater

- Fall from any level (includes from bed)

- Struck head or chest

- Time of injury within 48 hours of ED ["Emergency Department"] presentation

- ED presentation should be first medical contact, meaning that the patient has not been treated/evaluated and released by another medical provider for the same injury/event.

9.      Moreover, HCA decided to apply the criteria even in the absence of pre-hospital notification. Thus, even elderly persons who drove themselves to the hospital would be deemed a "Trauma Activation" if they had suffered a fall that met the above criteria.

10.     This new policy resulted in thousands of additional Trauma Activations that were not medically necessary and were not authorized by Medicare. Relator and his trauma colleagues were repeatedly exasperated after reporting to the Trauma Center to discover yet another elderly patient who should have been treated as an emergency room visit, but had been upgraded to a Trauma Activation strictly because of HCA's new policy. The situation became so bad that members of the Lawnwood Trauma Team began to jokingly refer to these unnecessary Trauma Activations as "Betty Whites."

11.     Upon information and belief, Lawnwood billed Medicare and other government healthcare programs for these unapproved and unnecessary Trauma Activations. Relator is a Trauma Surgeon so he is not immediately involved in billing. However, he is aware from his role

4

at the hospital that the hospital routinely bills a patient's insurance for all services rendered to that patient. Relator has seen patient charts reflecting billing codes and is aware that the hospital uses these charts, as well as provider notes and treatment logs to ascertain the available billing codes. Relator knows of no services routinely rendered to patients that are provided for free.

12.    Upon information and belief, HCA applied these unapproved trauma criteria at Trauma Centers other than Lawnwood.  The internal memorandum circulated by HCA that announced the new policy was labeled "organization-wide," a term that appears to reference additional Trauma Centers that are a part of the HCA organization.

13.    As a result of the unnecessary and unapproved Trauma Activations, HCA committed fraud on government healthcare programs.  The damages from Lawnwood alone are approximately $47.4 million.  Nationwide damages are much higher.

14.    HCA not only caused harm to the federal fisc; it also caused mental and financial harm to the thousands of elderly persons on fixed incomes who were forced to incur expensive and unnecessary 20% co-payment and deductible obligations arising from trauma services that should never have been performed. These elderly persons have also been subjected to unnecessary, often painful, medical procedures, not to mention other humiliating experiences associated with Trauma Activation, such as having their clothes cut from their body in a room full of medical personnel. Moreover, these unnecessary Trauma Activations exposed patients to potential harm, including but not limited to. adverse reactions to medications and contrast material.

## JURISDICTION AND VENUE

15.    This action arises under the False Claims Act. 31 U.S.C. §§ 3729, *et seq.*

16.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because Defendants can be found in, reside, and transact business in this District.

17.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because each Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District.  Therefore, venue is proper within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

18.     The specific facts and circumstances alleged in this Complaint have not been publicly disclosed in a federal criminal, civil or administrative hearing in which the Government or its agent is a party, nor in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or to the news media.

19.     To the extent any Court determines that a public disclosure has taken place, Relator is an original source of the information upon which this complaint is based, as that term is defined in 31 U.S.C. § 3730(e)(4)(B).  Specifically, prior to filing this action, Relator voluntarily disclosed to the United States the information on which his allegations are based and Relator, as a Trauma Surgeon routinely called in for unnecessary Trauma Activations, has knowledge that is independent of and would materially add to any publicly disclosed allegations or transactions.

## THE PARTIES

20.     The real party in interest is the United States of America.

21.     Relator, Dr. Patrick Regan, D.O., lives in Fort Lauderdale, Florida.  He is a general, acute care, pediatric, and trauma surgeon who is Board Certified by the American Board of Surgery.  Relator holds an undergraduate degree from the University of Scranton and a medical

degree from the Philadelphia College of Osteopathic Medicine.  He conducted his General Surgery Residency at the world-renowned Cleveland Clinic Foundation in Cleveland, Ohio.

22.     From approximately May 2011 to November 2012, Relator worked for Locum Tenens, LLC, a physician group that provided physician services to Lawnwood.  In that capacity, Relator worked onsite at Lawnwood performing general, acute care and pediatric surgery.  In or around November 2012, Relator became an employee of Lawnwood Healthcare Specialists, LLC ("LHS").  LHS is a physician practice group that provides trauma, surgery and other physician services to Lawnwood.  On information and belief, this physician practice group is owned and/or controlled by Lawnwood's corporate parent, HCA.

23.     After joining LHS, Relator continued to perform general, acute care and pediatric surgery at the hospital.  In or around that time, he also joined the hospital's Trauma Team as a Trauma Surgeon.  Since that time, on a regular basis, Relator has served on Trauma Call.  This requires Relator to be in the hospital for 24-hour shifts as the on-call surgeon for Trauma Activations.  Relator has personal, first-hand knowledge as to the types of patients for whom Lawnwood performs Trauma Activations, and he has personally evaluated and treated many of these patients.

24.     Defendant Lawnwood Medical Center, Inc., d/b/a Lawnwood Regional Medical Center & Heart Institute, ("Lawnwood") is a Florida corporation that operates a 380-bed acute-care hospital in Fort Pierce, Florida.  Among other services, Lawnwood operates a Level II Trauma Center.  In 2014, Beckers Hospital Review reported that Lawnwood -- a hospital located in the relatively small community of Fort Pierce Florida -- was among the top-50 grossing for-profit hospitals in the country.  Lawnwood is owned by its corporate parent HCA Healthcare Inc.

and is a member of HCA's East Florida Division, which consists of 14 hospitals and 12 outpatient centers.

25.     Defendant HCA Healthcare, Inc. ("HCA") is a Delaware corporation based in Nashville, Tennessee.   HCA owns and operates approximately 179 hospitals across the United States, including 46 hospitals in Florida, with 9 Trauma Centers.   In 2017, HCA had annual revenues exceeding $43.6 billion.

## THE MEDICARE PROGRAM

### Medicare Parts A, B & C

26.     Congress enacted the Medicare program in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*   The program provides medical insurance for persons age 65 and older or for certain persons under age 65 who are disabled.   The United States Department of Health and Human Services ("HHS") supervises the Medicare program through the Centers for Medicare and Medicaid Services ("CMS").   The Medicare program consists of several parts, including Parts A, B and C, all of which are at issue in this case.

27.     Medicare Part A, often referred to as hospital insurance, provides coverage for medically necessary inpatient care provided in a hospital, skilled nursing facility or psychiatric facility.   *See* 42 U.S.C. §§ 1395c – 1395i-4.   Medicare Part A coverage is automatically assigned to individuals who are retired and receive Social Security benefits.

28.     Medicare Part B, often referred to as medical insurance, goes beyond Medicare Part A.  Part B is a federally subsidized, voluntary health insurance program that provides supplemental insurance coverage for medical and other services excluded from Part A, including outpatient

hospital services.  *See* 42 U.S.C. §§ 1395c – 1395i-4.  Beneficiaries must enroll in the Medicare Part B program.

29.     Medicare Part C, also known as "Medicare Advantage," is an alternative program that allows Medicare beneficiaries to opt out of traditional fee-for-service coverage under Medicare Parts A and B and instead enroll in privately managed insurance plans that provide coverage for both inpatient and outpatient services.  *See* 42 U.S.C. §§ 1395w–21, 1395w–28. Medicare Part C authorizes private insurance companies, known as Medicare Advantage Organizations to run these plans and thereby act as administrators for the United States government in the provision of Medicare benefits.  These Medicare private health plans are known as Medicare Advantage Plans.

30.     To administer Parts A and B of the Medicare program, CMS contracts with private companies known as Medicare Administrative Contractors or "MACs."  The MACs act as agents of CMS to administer the programs, by processing and paying claims from providers for healthcare services delivered to beneficiaries.  *See* 42 § C.F.R. 421.5(b).

31.     In this case, on information and belief, Lawnwood submitted the false claims at issue to a MAC acting on behalf of the United States.

**Medicare Provider Enrollment Agreement**

32.     All healthcare providers who wish to accept payment from the Medicare program must agree to certain terms and conditions set forth in the Medicare Provider Enrollment Agreement, also known as the CMS 855B.  The CMS 855B is a contract between the provider and the Medicare program.  This contract contains the following language critical to this case:

Additional Requirements for Medicare Enrollment

These are additional requirements that the supplier must meet and maintain in order to fill the Medicare program. Read these requirements carefully. By signing, the suppliers attest to having read the requirements and understanding.

By his/her signatures, the authorized officials named below in the delegated officials named in section 16 agree to adhere to the following requirements stated in this certification statement:

…

**3. I agree to abide by the Medicare laws, regulations and program instructions that apply to the supplier**. The Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions … and on the suppliers compliance with the applicable conditions of participation in Medicare.

(Emphasis added).

33.     In other words, by agreeing to accept Medicare payment, a provider agrees to abide by Medicare's "laws, regulations and program instructions."  As set forth below, Lawnwood and HCA did not abide by these laws, regulations and program instructions when submitting bills related to Trauma Activations.  By doing so, Lawnwood and HCA breached their contractual obligations with CMS.  On information and belief, Lawnwood and HCA repeatedly submitted claims to government healthcare programs without disclosing this material breach of contract.  In doing so, Lawnwood and HCA submitted false claims within the meaning of the False Claims Act.

### Medicare Billing and Reimbursement

34.     Healthcare providers, or persons acting on their behalf, submit bills to the Medicare program using two standard claim forms: (1) the CMS 1450, also known as the UB-04, and (2) the CMS 1500.  Providers complete these forms, using the Healthcare Common Procedural Coding

System and Revenue Codes published by the National Uniform Billing Committee, as further described below.

### The CMS 1450 a/k/a the UB-04

35.     Following the discharge of Medicare beneficiaries from a hospital, a hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. *See* 42 C.F.R. 413.1, or 13.60, 413.64. To submit their bill, hospitals utilize a standard form known as the CMS 1450 or the UB-04. This form was created and is continually updated by the National Uniform Billing Committee ("NUBC").

36.     Hospitals use the UB-04 to submit hospital facility charges for patient care services rendered during the patient visit. The form consists of 81 fields of information, which are referred to as "form locators." These fields contain information regarding the facility, the patient, and the charges incurred, using a system of uniform billing codes, further described below. Today, almost all UB-04 claim forms are submitted electronically from hospitals to MACs.

### The CMS 2552 a/k/a Annual Cost Report

37.     Medicare reimburses hospitals using two prospective payment system that differ depending upon whether the patient has been classified as "inpatient" or "outpatient." As to inpatients, Medicare has adopted the Inpatient Prospective Payment System ("IPPS"), which utilizes a system known as Medicare Severity Diagnosis Related Groups or "MS–DRG" to assign charges for hospital services based on patient diagnosis, age, sex, and other factors. As to outpatients, Medicare has adopted an Outpatient Prospective Payment System ("OPPS"), which utilizes a system known as Ambulatory Payment Classifications or "APCs" to assign charges based on clinical characteristics and the resources required by those characteristics.

11

38.     As part of both systems, Medicare pays hospitals through a series of interim payments. At the end of each fiscal year, CMS requires hospitals to submit a Form CMS–2552, known as the "Hospital Cost Report," in order to reconcile all charges submitted for the year and all payments received for the year. The Hospital Cost Report constitutes the final claim that a hospital submits to Medicare for items and services provided to Medicare beneficiaries.

39.     After the conclusion of each fiscal year, the hospital files its Hospital Cost Report with the MAC, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. 1395g(a); 42 C.F.R. 413.20. Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare for any over-payments. *See* 42 C.F.R. 405.1803, 413.60, 413.64(f)(1).

40.     Like the CMS 855B, the Hospital Cost Report contains an express certification that must be signed by the chief administrator of the hospital. The certification provides as follows:

> CERTIFICATION   BY   OFFICER   OR   ADMINISTRATOR   OF
> PROVIDERS
>
> I HEREBY CERTIFY that I have read the above statement in that I have examined the accompanying electronically filed or manually submitted cost report and the balance sheet and statement of revenue and expenses prepared by (name of facility, ID number of facility) for the cost report. Beginning (date) and ending (date) and that to the best of my knowledge and belief, it is a true. correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of the Healthcare Services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**

(Emphasis added).

41.     By submitting the cost report, the Hospital thus promises CMS that the Hospital has provided all services "in compliance" with "the laws and regulations regarding the provision of healthcare services." Medicare relies on this promise in making payment. As set forth below, HCA repeatedly made this affirmation falsely to CMS. That is to say, Lawnwood and HCA repeatedly violated healthcare laws and regulations when submitting bills to CMS related to Trauma Activations. Any certification to the contrary was false.

### CMS Form 1500

42.     CMS has also adopted another form, the CMS 1500, for use in submitting claims to Medicare. This form is not commonly used by hospitals but is instead used by related providers, such as physicians who work in the hospital but are not employed directly by the hospital. The CMS 1500 consists of 33 fields, which contain information regarding the provider, the patient, and the charges incurred, using a system of uniform billing codes, further described below. Most CMS 1500 forms are submitted electronically from the provider to the MAC.

43.     Like the CMS 855B and the Hospital Cost Report, the CMS 1500 requires the provider to make a certification to Medicare. The CMS 1500 contains the following certification:

> Signature of Physician or Supplier (Medicare, Tri-care, the Black Lung)
>
> In submitting this claim for payment from federal funds, I certify that 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, program instructions, which are available from the Medicare contractor; 3) I have provided a will provide sufficient information required to allow the government to make an informed eligibility payment decision; 4) **this claim whether submitted by me or on my behalf by my designated billing company complies with all applicable Medicare and or Medicaid laws, regulations and program instructions for payment** including but not limited to the federal anti kickback statute physician self-referral law (commonly known as Stark law); 5) the services on this form are medically necessary and personally furnished by me or under my

13

direct supervision, except as otherwise expressly permitted by Medicare or
Tri-Care…

(Emphasis added).

44.     By submitting the CMS 1500, the provider thus promises Medicare that the
provider has rendered all services in compliance with "all applicable Medicare or Medicaid laws,
regulations and program instruction."  Medicare relies on this affirmation in making payment.  As
set forth below, Lawnwood and HCA did not abide by the Medicare laws and regulations and
program instructions when submitting bills related to Trauma Activations.  To the contrary,
Lawnwood and HCA repeatedly violated Medicare's laws and regulations and repeatedly
submitted bills without disclosing these material violations to Medicare.  To the extent providers
under the control of Lawnwood and/or HCA made certifications to the contrary, those
certifications were false.

**CPT Codes, HCPCS Codes & Revenue Codes**

45.     Each of the above standard CMS billing forms makes extensive use of a series of
billing codes that have been adopted within the healthcare industry to simplify the billing process.
Each of these codes carry their own definitions and instructions.  As such, when providers submit a
bill utilizing these codes, the codes themselves constitute affirmative representations that the goods
or items described by the codes were in fact delivered, under circumstances consistent with the
instructions for using those codes.

46.     The American Medical Association maintains and publishes the Current Procedural
Terminology or "CPT" codes.  The CPT system is a system that contains a set of codes,
descriptions and instructions intended to describe procedures and services performed by physicians
and other healthcare providers.  This system contains a listing of procedures and services, each of

14

which is associated a five-digit numeric code. These codes are used by providers to submit descriptions of charges for reimbursement.

47.     Medicare has adopted the Healthcare Common Procedural Coding System ("HCPCS") for use in all bills submitted to the Medicare program. The HCPCS system contains two levels of codes. The first level consists of a CPT code. As such, the HCPCS system incorporates the CPT coding system, including its definitions and instructions. As examples, the following HCPCS code plays a significant role in this case:

>   G0390         Trauma response team associated with hospital critical care
>                 service

48.     In addition, the National Uniform Billing Committee, which maintains the UB-04, has adopted a series of specialized codes and instructions solely for use with UB-04 claim form. Among other codes, the NUBC has adopted "Revenue Codes." A Revenue Code is a four-digit number assigned to each service or item provided by the hospital that designates the type of service performed or the area within the hospital where the service was performed.

49.     Each four-digit revenue code contains an "X," which is a variable intended to further specify a service or item. For example, the NUBC has adopted the revenue code "068X" to represents services delivered as part of trauma care. The X represents a variable to be changed, depending on the level of the Trauma Center (I through V). Thus, the Revenue Code 0682 indicates a service performed in a Level II Trauma Center.

50.     On an annual basis. CMS adopts and publishes extensive reimbursement schedules that set forth monetary amounts to be reimbursed to healthcare providers for each HCPCS code procedure. The reimbursement schedule also fluctuates depending upon the NUBC Revenue Code assigned to a particular item and procedure. In short. CMS relies upon these codes to determine

reimbursement. When a healthcare provider submits a claim form to CMS or a MAC using the CPT codes, HCPS codes and NUBC Revenue Codes, the use of these codes constitutes an affirmative representation that the goods and items described in the codes have been delivered consistent with the definitions and instructions that accompany these codes.

## TRAUMA SERVICES

51.     Trauma Centers vary in their specific capabilities and are classified by "Level" designations under State law.  Florida has devised a statutory scheme for classifying Trauma Centers, set forth in section 395.4045, Florida Statutes.  This scheme assigns a level ranking of I-IV, with Level I representing the highest level. The Florida Legislature has also authorized the Florida Department of Health to adopt and implement a set of rules to, among other things, establish certification standards for Trauma Centers, to establish a protocol to determine which Trauma Center should receive a given patient based on injuries and geographic proximity, and to determine when EMS responders must call a Trauma Alert.  The Florida Department of Health has published these regulations in Section 64J-2 of the Florida Administrative Code.

52.     One major component that distinguishes a Trauma Center is the 24-hour availability of a Trauma Team.  The Trauma Team consists of specially trained health care providers who have expertise in the care of trauma patients.  A Trauma Team consists of several members depending upon the resources of the hospital and its level of designation.

53.     Lawnwood is authorized by the State of Florida to operate a Level II Trauma Center.  Lawnwood operates three "trauma bays" adjacent to the hospital's Emergency Department.  The trauma bays are equipped to receive trauma patients and perform trauma

procedures when necessary.  Lawnwood also has a Trauma Intensive Care Unit or "ICU" and a Trauma Floor in the hospital.

54.     The Lawnwood Trauma Team consists of the following personnel:

> Trauma Surgeon
> Emergency Physician
> Anesthesiologist
> 2 Trauma Nurses
> Operating Room Charge Nurse
> Radiology Tech
> Respiratory Therapist
> Trauma Physician Assistant
> Medic
> Admitting Personnel
> Security Personnel
> Housekeeping Personnel

55.     On a rotating basis, professionals such as Relator are assigned to be on Trauma Call.  When on Trauma Call, Relator must remain in the hospital for a 24-hour shift, carrying a special trauma cell phone, ready to respond to any Trauma Activations.

**Trauma Activation**

56.     Trauma victims typically arrive to a Trauma Center by way of emergency transport, such as an ambulance or a helicopter.  When the Trauma Center receives pre-hospital notification, usually from an ambulance or other Emergency Medical Services ("EMS"), the hospital issues a Trauma Activation.  The Trauma Activation sends a signal to key members of the Trauma Team to drop what they are doing and report immediately to the Trauma Center.

57.     When the Trauma Team is activated, team members respond to the Trauma Center and prepare for the worst.  Team members are usually assigned specific roles during patient resuscitation and evaluation, which roles they regularly rehearse and practice during drills and simulations.

58.     Patients who arrive by way of a Trauma Activation receive medical treatment and attention different from the treatment received in an emergency room. As an example, trauma nurses immediately use scissors to cut a trauma patient's clothes away from the body, in order to allow a full trauma exam. Trauma clinicians typically order more laboratory, diagnostic and imaging testing to review the patient's condition. Also, trauma surgeons, like Relator, evaluate every trauma patients for any immediate surgery that might need to be performed.

59.     At Lawnwood, key members of the Trauma Team carry trauma cell phones to alert them of Trauma Activations. A public announcement system at the hospital also announces Trauma Activation within the hospital so that all members of the Trauma Team can report promptly to the Trauma Bay to receive incoming patients. The decision to initiate a Trauma Activation is typically made by EMS or by the Emergency Department Charge Nurse based on the standards and criteria set forth below.

### State of Florida Criteria

60.     Many state and local governments around the country have adopted trauma criteria to govern the circumstances under which EMS will trigger a Trauma Activation or Trauma Alert. In Florida, all local governments must follow standards approved by the Florida Department of Health and published in the Florida Administrative Code. *See* 395.40405(3) ("Trauma alert victims shall be identified through the use of a trauma scoring system, including adults and pediatric assessment as specified in rule of the [Florida Department of Health].").

61.     The Department has published its trauma criteria in Section 64J-2 of the Florida Administrative Code. These standards define "Trauma Alert" as follows:

(13) Trauma Alert – means a notification initiated by EMS informing a hospital that they are in route with a patient meeting the trauma alert criteria.

Rule 64J-2.001(13), F.A.C.  Rule 64J–2.002, titled "Prehospital Requirements for Trauma Care," requires EMS providers to "insure that a prehospital trauma alert is issued upon determining that a trauma patient meets the requirements of rule 64J-2.004 or 64J-2.005."  The rule further provides that

The words "trauma alert" shall be used when notifying the trauma center, or hospital that EMS is in route with a trauma patient."

*Id.*

62.    The Florida Department of Health has adopted rules that set forth specific criteria for triggering a Trauma Alert.  *See* Rule 64J–2.004 (adult trauma criteria); 64J–2.004 (pediatric trauma criteria).  The rule for adult trauma criteria requires EMS to follow four steps.  In Step 1, EMS must evaluate the patient for a variety of factors using a scorecard methodology.  *See* Rule 64J–2.004(2)-(3). The Florida Department of Health has published a color-coded scorecard to help EMS providers apply the rule quickly and easily in field triage situations:

(The rest of this page intentionally left blank.)

19

## Adult Trauma Scorecard Methodology

Red, any one (1), transport as trauma alert; Blue, any two (2), transport as trauma alert

| Component | Blue | Red |
|---|---|---|
| Airway | • Sustained respiratory rate ≥ 30 | • Active airway assistance[1] |
| Circulation | • Sustained heart rate ≥ 120 | • No radial pulse _and_ a sustained HR > 120 **or** <br>• Systolic BP < 90 mmHg |
| Best Motor Response (BMR) | • BMR = 5 | • GCS ≤ 12 <br>• BMR = 4 or less <br>• Presence of paralysis <br>• Suspicion of spinal cord injury <br>• Loss of sensation |
| Cutaneous | • Soft tissue loss[2] <br>• GSW to the extremities | • 2" or 3" burns to 15% or more TBSA <br>• Amputation proximal to the wrist or ankle <br>• Any penetrating injury to the head, neck or torso[3] |
| Long Bone Fracture[4] | • Sign or symptoms of a single fracture site due to MVC or Fall 10' or more | • Sign or symptoms of a fracture of two or more long bone sites |
| Age | • 55 years or older | |
| Mechanism of Injury | • Ejection from motorvehicle[5] <br>• Steering wheel deformity[6] | |
| Judgment | | • EMT or Paramedic discretion[7] |

1 Airway assistance beyond administration of oxygen; 2 Degloving injuries , major flap avulsions (>5in); 3 Excluding superficial wounds in which the depth can be easily determined; 4 Long bone including humerus, radius/ulna, femur and tibia/fibula. 5 Excludes motorcycles, mopeds, ATV's, bicycles or the open body of a pick-up truck. 6 Only applies to driver of vehicle; 7 If the patient does not meet any of the criteria listed above and the onscene EMT, Paramedic or Field Supervisor believes the patient may benefit from Trauma Alert criteria due to extenuating circumstances surrounding the incident, the patient may be classified as a 'Trauma Alert' and therefore transported to the closest trauma center. It shall be documented in the patient care report as required in section 64J-2.013, F.A.C.

63.     In the Florida trauma industry, professionals refer to these criteria as the "reds" and "blues." Red criteria are more serious than blue criteria. Thus, any one red criteria calls for a Trauma Alert, while any two (2) blue criteria calls for a Trauma Alert. Under the Florida criteria, age is one of the blue criteria, *i.e.*, "55 years or older." Because age is a blue criteria, age alone is not a mandatory basis of Trauma Alert. However, age can be a basis for Trauma Alert if combined with another blue criteria, for example, ejection from a motor vehicle, or fall from greater than 10 feet.

64.     If EMS finds no trauma in Step 1, it proceeds to Step 2, which requires EMS to evaluate the patient on the Glasgow Coma Scale, a test used to determine a person's level of consciousness.  If a patient scores below 12, the state criteria directs EMS to trigger a Trauma Alert.  *See* Rule 64J–2.004(4).

65.     If EMS finds no trauma in Step 2, it proceeds to Step 3, which allows EMS to trigger a Trauma Alert based on "local criteria." *See* Rule 64J–2.004(5).  As an example, some local EMS providers have adopted Trauma Transport Protocol that allows them to trigger a Trauma Alert based on electrocution.  However, local EMS cannot adopt or follow a local protocol unless that protocol has been submitted and approved by Florida Department of Health.  *Id.*

66.     Finally, in Step 4, the Florida trauma criteria allows EMS providers to call a Trauma Alert at any time, even without red or blue criteria, based on paramedic discretion:

> [T]he EMT or paramedic can call a trauma alert if, in his or her judgment, the patient's condition warrants such action.

*See* Rule 64J-2.004(6).  This criteria recognizes that no scorecard can fully anticipate everything that EMS personnel might see in the field and that, at times, EMS must be given discretion to call a Trauma Alert based on factors that do not appear on the scorecard.  When this happens, however, it must be documented in the patient records:

> Where EMT or paramedic judgment is used as the basis for calling a trauma alert, it shall be documented in patient care record ....

*Id.*

67.     Failure to satisfy the Florida trauma criteria does not mean the patient has not been severely injured or that the patient does not need immediate medical attention.  It merely means that the patient should not be treated as a "Trauma Alert" and need not be transported a facility

equipped to handle traumatic injuries.  Indeed, in the vast majority of EMS encounters, patients do not meet trauma criteria, and EMS transports patients to a traditional hospital ER, which is fully equipped to handle the patient's medical condition.

### Local Trauma Transport Protocols

68.     Most EMS services in Florida are operated by county agencies.  The Lawnwood Trauma Center regularly receives trauma patients from the following EMS agencies:  Indian River County Fire Rescue, St. Lucie County Fire Rescue, Martin County Fire Rescue, and Okeechobee County Fire Rescue.   Each of these department have adopted and submitted local Trauma Transport Protocols to the Florida Department of Health.  All of these protocols track the state criteria.

69.     These local protocols do not deviate from the state criteria.  However, one aspect of Indian River County's protocol is relevant to this case.  In 2017, Indian River added a column to the State's red and blue chart.  Indian River called the new column the "Trauma Grey" criteria, defined as follows:

|  | GREY |
| --- | --- |
| Age | 55 years or older |
| Mechanism of Injury | BLUNT HEAD, CHEST, ABDOMINAL, MUSCULOSKELETAL TRAUMA IN PATIENT ON ANTICOAGULANTS OR BLEEDING DISORDERS<br><br>BLUNT ABDOMINAL or CHEST TRAUMA IN PATIENT WITH HISTORY OF PARALYSIS (PARAPLEGIA or QUADRIPLEGIA)<br><br>EITHER ELECTROCUTION or LIGHTNING WITH LOSS OF CONSCIOUSNESS or VISIBLE SIGNS OF INJURY<br><br>SEATBELT MARK ON TORSO |

22

70.     As to this new criteria. Indian River EMS instructed its personnel to "consider" transport to a Trauma Center.  Significantly. however, any such transport would <u>not</u> be a trauma alert:

GREY = Consider transport to trauma center. NON TRAUMA ALERT

As to this criteria, therefore, the EMS personnel had to use their discretion to determine whether a given "Trauma Grey" patient should go to a Trauma Center or a hospital ER.  Even if EMS decided to go to Trauma Center, EMS could not call a Trauma Alert.

71.     As a result of HCA's new policy. however. HCA automatically upgraded the vast majority of these Trauma Greys to full Trauma Activations.  HCA often fabricated paperwork to claim these Trauma Alerts had been made based on "paramedic discretion," when that was not the case.  Indeed, Indian River's protocol *prohibited* EMS from calling a Trauma Alert for such patients.

### The Lawnwood Flowsheet

72.     When Lawnwood performs a Trauma Activation, the Trauma Team includes two Trauma Nurses.  One of the Trauma Nurses is referred to as the "Scribe Nurse."  The Scribe Nurse must complete a standard form called the Trauma Resuscitation Record/Flowsheet (hereafter "Flowsheet").  The Flowsheet records essential information about the patient and the reasons for Trauma Activation.

73.     The Flowsheet requires the Scribe Nurse to record the basis of "Activation," the "Mode of Transport," and the "Mechanism of Injury":

23

| ACTIVATION | MODE OF TRANSPORT | MECHANISM OF INJURY | | |
|---|---|---|---|---|
| ☐ Trauma Alert | ☐ Fire Rescue _____ | ☐ Auto | ☐ Driver | ☐ ATV |
| ☐ From Scene | ☐ Ambulance _____ | ☐ Passenger | ☐ Front | ☐ Back |
| ☐ Walk-In | ☐ Air (Helicopter) _____ | ☐ Seat Belt | ☐ Airbag | |
| ☐ Trauma Transfer | ☐ Walk-In | ☐ Motorcycle | ☐ Bicycle | ☐ Helmet |
| Hospital _____ | ☐ Police | ☐ Speed | ☐ Crush | ☐ Burn |
| Criteria_____ | ☐ Private Vehicle | ☐ Fall _____ ft. ☐ Ejection | ☐ Horse | |
| ☐ ER Upgrade | ☐ Other _____ | ☐ GSW | ☐ Stab | ☐ Assault |
| | | ☐ Pedestrian Verses Auto | | |
| | | ☐ Documented in Nursing Narrative | | |

74.     The Flowsheet also requires the Scribe Nurse to record the exact criteria that triggered the Trauma Activation.  The form was designed to comply with the Florida State trauma criteria.  Thus, the form contains checkboxes that mirror the State's red and blue criteria:

**ADULT CRITERIA (any one)**
☐ Active airway assistance more than oxygen
☐ Lack of radial pulse with sustained HR greater than 120 or systolic BP less than 90mmHg
☐ Best Motor Response of less than or equal to 4 (withdraws from pain) **OR**
    ☐ Paralysis **OR**
    ☐ Suspected spinal cord injury **OR**
    ☐ Loss of sensation
☐ 2nd or 3rd degree Burns greater than or equal to 15% TBSA **OR**
    ☐ Amputation proximal to wrist or ankle **OR**
    ☐ Penetrating injuries to head, neck or torso (excluding superficial wounds where the
        depth of the wound can be determined)
☐ 2 or more long bone fracture sites (humerus, radius/ulna, femur or tibia/fibula)

**ADULT CRITERIA (any two)**
☐ Respiratory Rate greater than or equal to 30
☐ Heart Rate greater than or equal to 120
☐ Best Motor Response of 5 (localizes pain)
☐ Major degloving injury **OR**
    ☐ Flap avulsion greater than 5 inches **OR**
    ☐ Gunshot wound to extremities
☐ Single long bone fracture from MVC or fall greater than or equal to 10 feet
☐ Age greater than or equal to 55
☐ Ejection from motor vehicle (excluding motorcycle, ATV, bicycle or the open body of a
    pick-up truck) **OR**
    ☐ Steering wheel deformed by driver

24

75.     Like the Florida State criteria, the Flowsheet also includes a box to record whether the Trauma Activation was triggered by "Paramedics Discretion," and if so, the reasons why:

**ADULT/PEDIATRIC CRITERIA**

☐ Paramedic discretion _____

_____

76.     Lawnwood completes a Flowsheet for every Trauma Activation patient.

### Medicare Program Instructions for Billing Trauma Activation Fees

77.     Medicare has adopted program instructions to cover reimbursement of critical care in the emergency room and trauma settings.  Medicare reimburses for critical care at two levels, depending upon the presence of Trauma Activation.   Medicare pays higher amounts of reimbursement for critical care when a Trauma Activation has taken place.  As such, hospitals like Lawnwood have a financial incentive to encourage Trauma Activations.

78.     Most of the Trauma Activations in this case took place on an outpatient basis. Hospitals submits claims for outpatient services to the OPPS system, using the UB-04 from. Emergency physicians and other non-hospital employees submit claims for outpatient services, using the CMS 1500.  Regardless of whether the provider submits a CMS 1500 or a UB-04, the form commonly uses the following codes:

> HCPCS G0390         trauma response team associated with hospital critical care services.
>
> Revenue Code 068X

79.     These are not the only codes billed during trauma care, but on information and belief, these codes are commonly used.  The definitions and instructions are set forth below.

## HCPCS Code G0390

80.     In 2007, CMS adopted a specific HCPCS code for trauma activation, G0390, defined as "Code Description:  Trauma response team associated with hospital critical care service."  CMS adopted this code in after a period of review and comment.  When the code was adopted, CMS published the following language in the Federal Register as to when the code could be used:

> If trauma activation occurs **under the circumstances described by the National Uniform Billing Committee guidelines that would permit reporting a charge under 68X**, the hospital may also bill one unit of code G0390, reported with revenue code 68X on the same date of service…

71, Federal Register 68134 (November 24, 2006) (emphasis added).

81.     CMS repeated this language in Section 160.1 of the Medicare Claims Processing Manual, stating:

> When critical care services are provided without trauma activation, the hospital may bill CPT code 99291, critical care, evaluation and management of the critically ill or critically injured patient; first 30-74 minutes (and 99292 if appropriate).  **If trauma activation occurs under the circumstances described by the NUBC, that would permit reporting a charge under 068x, the hospital may also bill one unit of code G0390**, which described trauma activation associated with hospital critical care services.
>
> …
>
> Medicare will pay for critical care at two levels, depending on the presence of trauma activation.  **To determine whether trauma activation occurs, providers follow the National Uniform Billing Committee (NUBC) guidelines** set forth in Pub 100-04, Ch. 25, section 75.4.

82.     In short, the Medicare program instructions make clear that G0390 can **only** be billed when Revenue 068X can be billed.  The use of HCPCS G0390 results in higher levels of

reimbursement, above and beyond normal emergency room services.  In other words, the hospital makes more money when it bills HCPCS Code G0390.

83.     To determine whether it is allowed to bill HCPCS Code G0390, the hospital must look to the instructions for Revenue Code 068X.

### Revenue Code 068X

84.     As explained earlier, Revenue Codes are four-digit codes adopted and maintained by the National Uniform Billing Committee ("NUBC") for use with the Form UB-04.  A Revenue Code denotes a type of service or an area within the hospital where the service was performed. Each Revenue Code includes a variable, an "X," to further denote a particular good or service. The Revenue Code for "trauma" is 068X.  In this case, Lawnwood operates a Level II, Trauma Center, so it bills trauma services under Revenue Code 0682.

85.     The NUBC publishes the instructions for billing Revenue Code 068X in its annual publication, *Official UB-04 Data Specifications Manual*.  It provides as follows:

> Revenue category 068 is used for patients for whom a trauma activation occurred. A trauma team activation/response is a "Notification of key hospital personnel in response to a triage information from pre-hospital caregivers in advance of the patient's arrival."
>
> …
>
> Only patients for whom there has been <u>pre-hospital</u> notification, who meet either local, state or American College of Surgeons field triage criteria, or are delivered by inter-hospital transfers, and are given the appropriate team response, can be billed by trauma activation fee charge. Patients who are drive-by or arrive without notification cannot be charged for activations, but can be classified as trauma under type of admission code 5 for statistical and follow-up purposes.

*See* NUBC Instructions (emphasis in original).

86.  CMS has repeated the NUBC standards in Pub 100-04. as follows:

Revenue category 068 is used for patients for whom a trauma activation occurred. A trauma team activation response is a "Notification of key hospital personnel in response to a triage information from pre-hospital caregivers advance of the patient's arrival."

Revenue category 068X is for reporting trauma activation costs only. It is an activation fee and not a replacement or a substitute for the emergency room visit fee....

...

Only patients for whom there has been pre-hospital notification. meet either the local, state or American College of Surgeons field triage criteria. or are delivered by inter-hospital transfers can be billed for trauma activation.  Patients who are "drive by" or arrive without notification cannot be charged for activation but can be classified as trauma under Type of Admission Code 5 for statistical and follow-up purposes."

87.  The NUBC instructions are significant because they set two important limitations upon the ability to use Revenue Code 068X, and in turn, G0390.  First, a hospital cannot submit bills for these codes absent "pre-hospital notification" of triage information.  This means the hospital cannot bill Trauma Activations fees for patients who arrive to the ER on their own means, or patients who are driven to the ER by friends or family.  The HCA Flowsheet refers to such patients as "Walk Ins."

88.  Second, the NUBC instructions make clear that a hospital cannot submit bills for these codes unless the patient satisfies "local, state or American College of Surgeons field triage criteria."  The use of the word "local" in this context means the criteria that applies to the Trauma Center in question.  In the State of Florida, Trauma Centers and EMS providers must follow the criteria adopted or approved by Florida Department of Health.  Trauma Centers cannot make up

28

their own new, unapproved trauma criteria and then submit Trauma Activation fees to Medicare for payment.

## Medical Necessity

89.    Finally, Congress has imposed a medical necessity requirement on all claims submitted to government healthcare programs.  Thus:

> (a) Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services—
>
> (1)(A) which, except for items and services described in a succeeding subparagraph, **are not reasonable and necessary** for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

*See* 42 U.S.C. 1395y (emphasis added).  Under this provision, a provider cannot submit claims to government healthcare programs for services that are not medically necessary or reasonable.  A provider who does so submits false claims within the meaning of the FCA.

90.    In the case of Trauma Activation fees, the standard for medical necessity is governed by the trauma criteria established and followed in the relevant geographic location.  In the State of Florida, the standard of care has been established by the Florida Department of Health.  If a hospital bills for Trauma Activations based on its own criteria, never reviewed or approved by the Florida Department of Health, the hospital submits medically unnecessary claims.

## THE FRAUDULENT SCHEME

91.    From March 2012 until the present, Relator has served as a Trauma Surgeon at Lawnwood, serving on Trauma Call on a regular basis.  From March 2012 until approximately January 2014, Relator noticed nothing unusual with Trauma Activations at Lawnwood.  That is to

say, Trauma Activations appeared to be generally consistent with the criteria required by Florida law.

92.      In or around January 2014, however, Lawnwood's hospital administration adopted new criteria for triggering Trauma Activations.  Relator learned of this new criteria during a peer review meeting conducted in or around January 2014.  During the meeting, Lawnwood's Director of Trauma announced that the hospital would be implementing new, additional trauma criteria aimed towards elderly patients.    To memorialize the new criteria, Lawnwood drafted a memorandum in or around January 2014.

93.      The Lawnwood memorandum violates the Medicare criteria for Trauma Activations in several respects.  First, it allows for Trauma Activations without pre-hospital notification.  The memorandum provides as follows:

> Patients meeting pre-established criteria are considered trauma alert patients. A trauma alert is called and the trauma team is mobilized when the trauma center is notified by EMS that a patient meets established criteria, **or if a patient who meets established criteria arrives by means other than EMS (e.g. private vehicle).**

(Emphasis added).    To the extent that Lawnwood billed for Trauma Activations without pre-hospital notification, Lawnwood violated the NUBC instructions, which were expressly incorporated into the Medicare program instructions for billing Trauma Activations.

94.      Second, the Lawnwood policy sets forth underlying criteria for Trauma Activations that have not been approved by the State of Florida, by NUBC, by CMS, or by the American College of Surgeons.  In particular, the memorandum requires "Full" Trauma Activation whenever a patient meets the following criteria:

- Age 75 years or greater

- fall from any level (includes from bed)

- Struck head or chest

- time of injury within 48 hours of ED presentation

- ED presentation should be first medical contact, meaning that the patient has not been treated/evaluated and released by another medical provider for the same injury/event.

95.     These criteria do not match the Florida State red or blue criteria.   While those criteria incorporate age and falls, they allow for a Trauma Activation only if the patient is above 55 and suffers a fall from greater than 10 feet.   The HCA criteria, in contrast, required *full* Trauma Activation for *any* fall, including ground level falls -- a fairly common ER visit for elderly patients.

96.     When Relator and other members of the Trauma Team first learned of these new criteria, they immediately objected and pointed out that this was a departure from established criteria. The members of the team were particularly concerned that elderly patients would be stuck with large co-payment and deductible obligations stemming from unnecessary (and extremely expensive) Trauma Activations.   Under the new criteria, even patients who were covered by insurance would find themselves facing enormous hospital bills because a routine ER visit had been upgraded to a full, Trauma Activation.

97.     In response to these objections, the Trauma Medical Director and the Trauma Director assured Relator and his colleagues that the hospital was implementing the new criteria solely as a trial.   They claimed the hospital did not plan to submit bills to Medicare or other third-

party payers for any Trauma Activation fees associated with the new criteria.  In short, this was solely an experiment.

98.     Relator did not believe this pronouncement.  Based on his years working for or with HCA, he did not believe the company would deliver medical services to anyone for free.  From the outset, he suspected the hospital had implemented the new criteria for one reason: to boost profits.

### Hospital Staff Follow the New, Unapproved Trauma Criteria

99.     As Relator predicted, the "experiment" soon became permanent.  Over the next four years, from 2014 to 2018, Lawnwood trained the ER staff on the new criteria and instructed them to trigger full Trauma Activations whenever they found an ER patient who met the criteria. Administrators even taped charts on the ER desktop near the phone that received incoming calls from EMS.  This was done to remind nurses and other staff to "upgrade" patients whenever possible.

100.    The new criteria resulted in an immediate boost in Trauma Activations.  Relator estimates that, from 2014 to 2018, Lawnwood performed approximately 8 to 10 Trauma Activations each day.   Of these, Relator estimates that approximately 1/3 resulted from the new criteria. On average, therefore, Lawnwood performed 2-3 of these Trauma Activations per day from 2014 to 2018.

101.    As time progressed, members of the Trauma Team began to openly scoff at the new criteria.  Repeatedly, the members of the Trauma Team found themselves mobilized for full Trauma Activations, only to find yet another elderly patient who had suffered a ground level fall. These types of patients, while injured and needing treatment, did not meet the true criteria for a

Trauma Activation and should more appropriately have been handled as ER patients.  Members of the team began to refer to these patients as "Betty Whites."

102.   EMS personnel also openly scoffed at the new "Betty White" criteria.   On multiple occasions, Relator observed EMS personnel arrive at the Lawnwood ER with an elderly patient, only to find themselves re-directed to the Trauma Bay.  EMS personnel often laughed openly in the hallway at the prospect that the patient in question required a full Trauma Activation.  Based on their training and experience, they knew full well that the patient did not meet any criteria they had been trained to classify as "trauma."  Indian River EMS, in particular, had been trained not to call a Trauma Alert for the "Trauma Grey" criteria.

103.   Trauma Team members were also concerned about the impact of unnecessary Trauma Activations on the patients themselves.  Most of the "Betty White" patients were elderly persons on fixed incomes.  These activations resulted in large co-payments and deductibles, as well as painful and unnecessary medical testing.  Elderly female patients, in particular, found it humiliating to have their clothes cut from their body, a routine part of trauma care.  At least one trauma surgeon, an employee of Locums Tenens, LLC, resigned in frustration, partly over the number of unnecessary Trauma Activations.

104.   Significantly, the Lawnwood Flowsheet did not (and still does not) contain space to check off the new criteria adopted by HCA in January 2014.  The form was designed to match the Florida State criteria.  To record the basis of activation, therefore, Scribe Nurses often inserted the phrase "ER protocol," which was shorthand for trauma upgrades made by ER in response to the new "Betty White" criteria.

### Specific Representative Examples

105.   The new criteria resulted in thousands of unapproved, medically unnecessary Trauma Activations from 2014 to 2018.  Following are five (5) representative examples.

### Patient C.R.

106.   C.R. was an 89-year-old who came to the Lawnwood ER as a "walk in" on March 29, 2018.   Lawnwood had no pre-hospital notification of C.R.'s arrival, and he/she did not meet any Medicare-approved criteria for Trauma Activation.

107.   Despite this, HCA upgraded C.R. to a full Trauma Activation upon arrival to the ER.  Relator served as the Trauma Surgeon who responded to this Trauma Activation, and he has personal knowledge regarding this patient.   A Scribe Nurse also responded to the Trauma Activation and completed a Trauma Flow Sheet to document the reasons for the Trauma Activation. As set forth in the Flow Sheet, the Scribe Nurse recorded C.R. as a "walk-in." *Id.*  The Scribe Nurse checked none of the State's red or blue criteria for Trauma Activation.  Instead, the sole basis of Trauma Activation was the following notation:



108.   The initials "GL" stand for "ground level."  In short, C.R. was a "Betty White" – an elderly person who had suffered a ground level fall.  There was no valid, Medicare-approved basis for this Trauma Activation.

34

109.    C.R. was insured by Medicare Parts A and B.  On information and belief, in or around March 2018, Lawnwood submitted bills to the MAC for C.R.'s Trauma Activation which included, among other codes, CPT Codes G0390. Revenue Code 0682.  By submitting these bills, Lawnwood made misleading and half-true statements to the MAC.  That is to say, Lawnwood represented that trauma services had been performed, but failed to disclose its non-compliance with material laws, regulations and contract terms regarding Trauma Activation.

### Patient T.K.

110.    T.K. was an 81-year-old who was brought to the Lawnwood ER by EMS on March 29, 2018.   T.K. did not meet the State criteria for Trauma Alert, and EMS did not call a Trauma Alert for this patient.  Instead, EMS merely brought T.K. to the Lawnwood ER after he suffered a fall.

111.    Despite this, Lawnwood upgraded T.K. to a full Trauma Activation upon arrival to the ER.  Relator served as the Trauma Surgeon who responded to this Trauma Activation, and he has personal knowledge regarding this patient.  A Scribe Nurse also responded to the Trauma Activation and completed a Trauma Flow Sheet to document the reasons for the Trauma Activation.  As set forth in the Flow Sheet, the Scribe Nurse recorded this patient as "ER Upgrade."  The Scribe Nurse checked none of the State's red criteria and only one of the State's blue criteria for Trauma Activation (two blue criteria are required for activation, not one).   The Scribe Nurse recorded the reason for Trauma Activation as follows:



112.   In short, T.K was not a true Trauma Activation but an elderly person who had fallen.

113.   The Flow Sheet was also factually false to the extent the Scribe Nurse checked "Paramedic Discretion." This Trauma Activation was not made by EMS discretion. This was an upgrade decision made by Lawnwood, based on the "Betty White" criteria. HCA often instructed Scribe Nurses to the check the "Paramedic Discretion" box whenever making "Betty White" Trauma Activations. In truth, there was no Medicare-approved basis for this Trauma Activation.

114.   T.K. was insured by Medicare Parts A and B. On information and belief, in or around March 2018, Lawnwood submitted bills to the MAC for T.K.'s Trauma Activation which included, among other codes, CPT Code G0390 and Revenue Code 0682. By submitting these bills, Lawnwood made misleading and half-true statements to the MAC. That is to say, Lawnwood represented that trauma services had been performed but failed to disclose its non-compliance with material laws, regulations and contract terms regarding Trauma Activations.

### Patient E.F.

115.   E.F. was a 91-year-old who was brought to the Lawnwood ER by EMS on March 29, 2018. E.F. did not meet the State criteria for Trauma Alert, and EMS did not call a Trauma Alert for this patient. Instead, EMS merely brought E.F. to the Lawnwood ER after he suffered a fall.

116.   Despite this, HCA upgraded E.F. to a full Trauma Activation. Relator served as the Trauma Surgeon who responded to this Trauma Activation, and he has personal knowledge regarding this patient. A scribe nurse also responded to the Trauma Activation and completed a Trauma Flow Sheet to document the reasons for the Trauma Activation. As set forth in the Flow

Sheet. the Scribe Nurse recorded this patient as "ER Upgrade." The Scribe Nurse checked none of the State's red criteria and only one of the State's blue criteria for Trauma Activation (two blue criteria are required for activation, not one). The Scribe Nurse recorded the reason for Trauma Activation as follows:



117.    Within the Trauma Center, Scribe Nurses often used the term "ER protocol" as a shorthand for the "Betty White" criteria. In short, E.F was not a true Trauma Activation but an elderly person who had fallen.

118.    The Flow Sheet was also factually false to the extent the scribe nurse checked "Paramedic Discretion." This Trauma Activation was not made by EMS. This was an upgrade decision made by Lawnwood, based on the "Betty White" criteria. In truth, there was not Medicare approved basis for this Trauma Activation.

119.    E.F. was insured by Medicare Parts A and B. On information and belief, in or around March 2018, Lawnwood submitted bills to the MAC for E.F.'s Trauma Activation which included, among other codes, CPT Code G0390 and Revenue Code 0682. By submitting these bills. Lawnwood made misleading and half-true statements to the MAC. That is to say, Lawnwood represented that trauma services had been performed but failed to disclose its non-compliance with material laws, regulations and contract terms regarding Trauma Activations.

**Patient R.I.**

120.    R.I. was a 78-year-old who was brought to the Lawnwood ER by EMS on March 30. 2018. R.I. did not meet the State criteria for Trauma Alert. and EMS did not call a Trauma

Alert for this patient.  Instead, EMS merely brought R.I. to the Lawnwood ER after he suffered a fall.

121.    Despite this, HCA upgraded R.I. to a full Trauma Activation.  Relator served as the Trauma Surgeon who responded to this Trauma Activation, and he has personal knowledge regarding this patient.  A Scribe Nurse also responded to the Trauma Activation and completed a Trauma Flow Sheet to document the reasons for the Trauma Activation.  As set forth in the Flow Sheet, the Scribe Nurse recorded this patient as "ER Upgrade."  The Scribe Nurse checked none of the State's red criteria and only one of the State's blue criteria for Trauma Activation (two blue criteria are required for activation, not one).   The Scribe Nurse recorded the sole reason for Trauma Activation as follows:



122.    Within the Trauma Center, Scribe Nurses often used the term "ER protocol" as a shorthand for the "Betty White" criteria.  In short, R.I. was not a true Trauma Activation but an elderly person who had fallen.

123.    The Flow Sheet was also factually false to the extent the Scribe Nurse checked "Paramedic Discretion."  This Trauma Activation was not made by EMS.  This was an upgrade decision made by Lawnwood, based on the "Betty White" criteria.  In truth, there was no valid, Medicare approved basis for this Trauma Activation.

124.    R.I. was insured by Medicare Parts A and B.  On information and belief, in or around March 2018, Lawnwood submitted bills to the MAC for R.I.'s Trauma Activation which included, among other codes, CPT Code G0390 and Revenue Code 0682.  By submitting these bills, Lawnwood made misleading and half-true statements to the MAC.  That is to say,

38

Lawnwood represented that trauma services had been performed but failed to disclose its non-compliance with material laws, regulations and contract terms regarding Trauma Activations.

**Patient F.H.**

125.    F.H. was a 91-year-old who was brought to the Lawnwood ER by EMS on April 6, 2018.   F.H. did not meet the State criteria for Trauma Alert, and EMS did not call a Trauma Alert for this patient.  Instead, EMS merely brought Patient F.H. to the Lawnwood ER after he suffered a fall.

126.    Despite this, the ER physician, following instructions from HCA, upgraded F.H. to a full Trauma Activation.  Relator served as the Trauma Surgeon who responded to this Trauma Activation, and he has personal knowledge regarding this patient.  A scribe nurse also responded to the Trauma Activation and completed a Trauma Flow Sheet to document the reasons for the Trauma Activation.

127.    As set forth in the Flow Sheet, the Scribe Nurse recorded this patient as "ER Upgrade."   The Scribe Nurse checked none of the State's red or blue criteria for Trauma Activation:



128.    In short, F.H was not a true Trauma Activation but simply an elderly person who had fallen.

129.    The Flow Sheet was also factually false to the extent the scribe nurse checked "Paramedic Discretion."   This Trauma Activation was not made by EMS.   This was an upgrade decision made by Lawnwood, based on the "Betty White" criteria.  HCA often instructed Scribe

Nurses to the check the "Paramedic Discretion" box whenever making "Betty White" Trauma Activations. In truth, there was not Medicare approved basis for this Trauma Activation.

130. F.H. was insured by Medicare Parts A and B. On information and belief, in or around March 2018, Lawnwood submitted bills to the MAC for F.H.'s Trauma Activation which included, among other codes, CPT Codes G0390 and Revenue Code 0682. By submitting these bills, Lawnwood made misleading and half-true statements to the MAC. That is to say, Lawnwood represented that trauma services had been performed but failed to disclose its non-compliance with material laws, regulations and contract terms regarding Trauma Activations.

## Other Patients

131. The above examples are representative only. Relator has personal knowledge that Lawnwood performed many additional Trauma Activations under circumstances that did not satisfy valid, Medicare-approved criteria for Trauma Activation and billing. On information and belief, Lawnwood submitted similar bills to Medicare for these invalid Trauma Activations. All such bills were misleading and half-true. That is to say Lawnwood represented that trauma services had been performed, but failed to disclose its own non-compliance with material laws, regulations and contract terms regarding Trauma Activation.

132. On information belief this practice was not limited solely to Lawnwood, but also extended to other hospitals within the HCA hospital system. In particular, the internal memorandum authorizing the new criteria was labeled "organization wide." As such, HCA has been engaged in an ongoing nation-wide scheme to submit false and misleading bills associated with Trauma Activations to government healthcare programs.

**Lawnwood Suspends Criteria After Discovering 86% Over-Triage Rate**

133.     By April 2018, the medically unnecessary Trauma Activations at Lawnwood became so brazen that even HCA recognized it had a problem.  In or around April 2018, Relator learned at a peer review meeting that HCA planned to modify the "Betty White" criteria. Lawnwood's Trauma Medical Director advised Relator and the other team members that "Brentwood" (shorthand language for HCA's corporate headquarters) had become concerned because a recent review showed that Lawnwood had an over-triage rate of 86%.  HCA was concerned this number would look suspicious during an upcoming survey of the Trauma Center to be conducted by the ACS.

134.     Lawnwood's response was to modify the "Betty White" criteria and create a new level of review, short of a full Trauma Activation, known as "Trauma Priority" or "Trauma Grey." The Director of Trauma Services explained the policy as follows in an April 2018 email:

> Please see below for the new "Ground Level fall—Trauma Priority" we are rolling out next week.  The protocol was approved at the trauma peer and PI meetings last month, as well as by Dawn Thompson, Dr. Winans and Dr Curcio!
>
> The plan for how this will operate is as follows….
>
> -EMS calls in a trauma "Grey" or calls in a ground level fall (GLF)—or patient walks-into triage
>
> -Charge RN, Triage RN and or ED physician determines if patient meets trauma activation (state red/blue), Trauma "Priority" (GLF) or no
>
> Criteria  (GLF criteria = over 65 on anticoagulant with obvious injury or sign of head trauma with NO loc or change in Mental Status)

135.    The modified "Trauma Grey" criteria thus consisted of the following:

- Over 65
- Suffered a fall
- On anti-coagulants
- Obvious injury or sign of head trauma
- No LOC or change in mental status

136.    If a patient met this criteria, he or she would not receive a full Trauma Activation. Instead, the patient would be evaluated by the ER physician and one (1) Trauma Nurse.  The rest of the Trauma Team would be placed on stand-by while the smaller team (the ER doctor and the Trauma Nurse) conducted their evaluation to determine, on a case-by-case basis, whether full Trauma Activation was necessary.

137.    On a regular basis, Lawnwood posts data and charts on a billboard available to the Trauma Team.  A recent chart showed the Over/Under Triage Rates for January and February 2018 – dates before the new policy was implemented. The charts show an over-triage rate for January 2018 of 84.8%, and over-triage rate for February 2018 of 88.08%.   Knowing these numbers would be reviewed in the upcoming survey, an administrator wrote the following on the charts:

Over Triage WAY Too High

138.    On information and belief, the number of invalid Trauma Activations declined after the new policy was implemented in late April 2018.

**Damages**

139.    Relator estimates that Lawnwood performed approximately three (3) unnecessary "Betty White" Trauma Activations per day from January 1, 2014 up to April 30, 2018.  Relator estimates that each medically unnecessary Trauma Activation resulted in approximately $10,000

42

of additional billing that would not have taken place had the patient been treated as a normal ER patient.

140.    Relator therefore estimates that the government incurred approximately $47.4 million in damages based on unnecessary Trauma Activation at Lawnwood alone, with the math as follows:

(# of Days) X (# of Activations) X (Unnecessary Charges) = Total

1,580  X 3 X (at least) $10,000 = $47.4 million

141.    Relator believes HCA has implemented the same "Betty White" criteria at its other Trauma Centers, as well.  He believes this because the January 2014 memorandum that established the new criteria was labeled "organization-wide."

142.    HCA has Trauma Centers throughout the nation, including nine (9) Trauma Centers in the State of Florida, as follows:

| Name | Level | County |
|------|-------|--------|
| Aventura Hospital and Medical Center | II | Miami-Dade |
| Blake Medical Center Level II Manatee | II | Manatee |
| Central Florida Regional Hospital | II | Seminole |
| Ft. Walton Beach Medical Center | II | Okaloosa |
| Kendall Regional Medical Center | I | Miami-Dade |
| Lawnwood Regional Medical Center & Heart Institute | II | St. Lucie |
| Orange Park Medical Center Provisional | II | Clay |
| Osceola Regional Medical Center | II | Osceola |
| Regional Medical Center Bayonet Point | II | Pasco |

143.    On information and belief, HCA's other Trauma Centers in Florida and around the nation also submitted false and misleading claims to government healthcare programs arising from medically unnecessary and invalid Trauma Activations.  These damages far exceed those incurred at Lawnwood.

## COUNT I:
### Violation of the Federal False Claims Act
### 31 U.S.C. 3729, et seq.

144.    Relator incorporates paragraphs 1 through 143 of this Complaint as though fully set forth herein.

145.    This count sets forth claims for treble damages, penalties and other damages as provided for under the federal False Claims Act, 31 U.S.C. 3729-3732, as amended.

146.    By engaging in the conduct described in this Complaint, Defendants knowingly submitted false claims to the United States of America.  In doing so, Defendants knowingly violated:

  a.    31 U.S.C. 3729(a)(1)(A) by presenting or causing to be presented false or fraudulent claims for payment or approval; and

  b.    31 U.S.C. 3729(a)(1)(B) by making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States.

147.    Because of the false or fraudulent claims made by Defendants, the United States suffered damages and is therefore entitled to recovery as provided by the False Claims Act of three times the amount of damages sustained by the United States, plus a civil penalty as set forth by statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator requests:

A.      That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' action, plus the maximum civil penalty allowed by law for each action in violation of 31 U.S.C. § 3729;

B.      That in the event the United States intervenes in this action, Relator be awarded 25% of the proceeds of the action or the settlement of any such claim;

C.      That in the event the United States does not intervene in and proceed with this action, Relator be awarded 30% of the proceeds of this action or the settlement of any such claim;

D.      That Relator be awarded all costs, attorneys' fees, and litigation expenses; and

E.      That the United States and Relator receive all relief, both at law and in equity, to which they may reasonably be entitled.

## **Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, the Relator hereby demands a trial by jury.

(The rest of this page intentionally left blank.)

45

Dated:  October 12, 2018

Ryon McCabe (FL 009075)
McCabe Rabin, P.A.
1601 Forum Pl #201
West Palm Beach, FL 33401
Telephone (561) 659-7878
Email: rmccabe@mccaberabin.com
e-filing@mccaberabin.com

Frederick M. Morgan, Jr. *Pro Hac Vice Pending*
Jennifer M. Verkamp *Pro Hac Vice Pending*
Jillian Estes (FL 55774)
Morgan Verkamp LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Telephone:  (513) 651-4400
Email: rmorgan@morganverkamp.com
jverkamp@morganverkamp.com
jestes@morganverkamp.com

*Counsel for Relator Patrick Regan, D.O.*

**DO NOT SERVE**

**FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL**